UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CATHERINE J. MORRISON,     )
                              )
         Plaintiff,         )
                              )
     vs.                   )     Case No. 4:14 CV 1420 CDP
                              )
CAROLYN COLVIN,        )
                              )
         Defendant.     )

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying Morrison's application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq., and application for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. Section 205(g) of the Act, 42 U.S.C. §§ 405(g), provides for judicial review of a final decision of the Commissioner. Morrison claims she is disabled from headaches, seizures, vertigo, and posttraumatic stress disorder. Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision of the Commissioner.

## Procedural History

Morrison protectively filed for benefits on March 28, 2013. On April 17, 2014, following a hearing, the ALJ denied Morrison's applications for benefits.

The Appeals Council of the Social Security Administration (SSA) denied her request for review on June 11, 2014.   Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the Administrative Law Judge

### Application for Benefits

In her application for benefits, Morrison stated that she was unable to work due to headaches, seizures, vertigo, memory loss, and posttraumatic stress disorder. Morrison is five feet, five inches tall, and at the time she applied for benefits she weighed 112 pounds.  She completed high school and lives with her mother. Morrison's past work included grocery store clerk, marketing director, property manager, receptionist, and a self-employed recreational park owner and painter. Her listed medications included albuterol, clonazepam, fioricet, Flexeril, Flonase, Keppra, meclizine, and a muscle relaxer.  (Tr. 198-201).

In her accompanying Function Report, Morrison stated that her daily activities depend on how she feels each day.  On a good day, Morrison showers, cleans house, and does laundry.  However, if she has vertigo she is unable to do anything without help and sleeps all day.  Her daughter or mother cares for the family pets.  Morrison reported that she is now unable to drive, work, or have a "normal lifestyle" because of her conditions.  Morrison sleeps a lot, and her medications make it hard to function.  Morrison stays in her pajamas and only

bathes on days she feels "stable." She doesn't fix her hair or shave, and someone cooks for her or "she doesn't eat." She sometimes needs help going to the bathroom and needs reminders to take her medication. Morrison says she can no longer prepare meals because of pain and lack of balance. She does laundry "very infrequently." Her mother and daughter do the housework. Morrison "seldom" goes outside, and she does not drive or go out alone because of seizures, dizziness, and headaches. She does not shop, but she is able to pay bills, handle a savings account, count change, and use a checkbook. Morrison listed "taking care of her grandson" as her hobby, but she is unable to do so without assistance. She watches television daily and attends church sometimes. Morrison and her youngest daughter have trouble getting along because Morrison is unable to do activities with her. Morrison stated that her conditions affect her ability to lift, squat, bend, stand, walk, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. She has trouble following verbal instructions and handles stress very poorly. Morrison said she has a hard time making simple decisions and is confused, anxious, tired, and depressed. She claims that "no one understands how hard it is to not remember things" and reports that her "problems continue to get worse." (Tr. 231-38).

<u>Medical Records</u>

On November 19, 2010, Morrison obtained a psychiatric evaluation from

Psych Care Consultants.  She reported a history of depression and anxiety.
Morrison reported feeling stressed because of traumatic events in her life.
Diagnostic impression was major depressive disorder, with recurrent cannabis
abuse and cocaine abuse in remission.  Morrison was prescribed Lexapro and told
to refrain from marijuana use.  (Tr. 854, 857).

Morrison saw her treating neurologist, Michelle Wood, D.O., on January 30,
2012.  Dr. Wood noted that Morrison was "very out of it."  Morrison reported
feeling dizzy and stated that she had not been taking the full dose of lamictal until
recently.  Morrison said that Dr. Wood had recently increased her dosage, but Dr.
Wood noted that she had actually increased the dosage in December of 2010.
Morrison told Dr. Wood that she has memory loss and "can't remember [her] kids'
childhood."   She also reported her last seizure as being some time in 2011.
Morrison told Dr. Wood that she has headaches every day and that her vertigo is
triggered by moving her head or her eyes.  Dr. Wood recommended weaning
Morrison off lamictal, starting her on Keppra, and checking for memory loss.  (Tr.
452).

On April 1, 2012, Morrison visited the emergency room complaining of
abdominal pain and cramping.  Records noted a history of depression and seizures,
as well as polysubstance abuse.  An abdominal CT revealed ovarian cysts, as well
as edema in the abdomen.  The physician diagnosed abdominal pain and prescribed

Phenergan.  (Tr. 556-69, 567).

Morrison saw Dr. Wood again on April 30, 2012.  She reported losing her insurance and said that she was going to see "the disability neurologist and psychiatrist."  Morrison reported several traumatic life events, including being the victim of an attempted rape.  Morrison said she continues to have vertigo and poor memory and has trouble focusing.  Morrison also stated that Keppra made her tired. Examination was within normal limits.  Morrison was observed to be alert and oriented, with normal tone, strength, and senses, symmetric reflexes, a steady gait, and normal coordination.  Diagnoses included epilepsy, unspecified, and anxiety.  Dr. Wood recommended continuing Morrison's current seizure medications and having her evaluated for memory loss and anxiety.  (Tr. 451).

On May 4, 2012, Morrison underwent evaluation by consultative examiner David Lipsitz, Ph.D., at the request of the state agency.  Morrison drove herself to the appointment and appeared appropriately dressed and groomed.  Dr. Lipsitz stated that her attitude was good and she was cooperative.  Morrison told Dr. Lipsitz she had epilepsy, vertigo, memory loss, depression, sleep issues, and racing thoughts.  Morrison also said she had attempted suicide in the past and been hospitalized for anxiety and suicide attempts.  Morrison was not being treated regularly by a psychiatrist or psychologist, and she was not seeing a counselor or therapist.  Morrison admitted smoking marijuana occasionally.  Morrison told Dr.

Lipsitz that she was attacked by a man who broke into her house in 2008. Examination revealed depressed mood, flat affect, and memory problems, but no current suicidal ideations. Her intellectual functioning was observed to be within the "low average range." Morrison's concentration was good, but her judgment and insight were poor. Morrison appeared to be preoccupied with her seizures, her memory problems, and her stress. Dr. Lipsitz diagnosed post-traumatic stress disorder and depression on Axis I and a Global Assessment of Functioning ("GAF") of 52. Dr. Lipsitz opined that Morrison needed ongoing psychiatric treatment and medication. He stated that Morrison was able to handle her own financial affairs and understand and remember instructions; however, she had some difficulty concentrating and persisting with tasks and significant difficulty interacting socially and adapting to her environment. (Tr. 444-47).

On May 24, 2012, Morrison underwent neuropsychological evaluation by Michael Oliveri, Ph.D., for memory loss. Dr. Oliveri noted a history of epilepsy, head injury, physical and emotional abuse, sexual assault, severe anxiety and depression. Morrison reported ongoing symptoms including vertigo and poor memory. Morrison told Dr. Oliveri that she was treated for depression with antidepressant medication and psychotherapy in the past, but that it was not helpful. Dr. Oliveri administered several tests to Morrison and observed that she had adequate attention, but her responses at times were protracted and inconsistent

with item difficulty. Dr. Oliveri opined that the test results probably did not fully represent Morrison's current ability because her "performance was grossly incompatible with neurologic reference groups." In addition, Morrison's "level of symptomatic endorsement markedly exceeded neurologic reference groups, and . . . psychiatric reference groups. Typically, such level of endorsement reflects marked cognitive symptom over-focus and/or atypical performance on symptom validity indicators (as in this case)." Morrison also "endorsed a much larger than average number of somatic symptoms rarely described by individuals with medical problems . . . [Her responses] may reflect elements of exaggeration (symptom magnification)." Dr. Oliveri's impressions included atypical neurocognitive profile, incompatible with acquired brain-behavior dysfunction. He opined that "[o]ftentimes, such a profile is referable to non-neurologic, pseudo-neurologic dysfunction wherein psychological factors, longstanding behavioral factors, and even motivational factors may be contributing to symptom performance and test performance." Dr. Oliveri's impressions also included somatoform disorder and depressive disorder. (Tr. 453-55).

On October 18, 2012, Morrison saw Joseph Beckmann, M.D., complaining of fever and weight loss. Morrison said her concentration and memory were preserved, but she reported a loss of appetite, some feelings of dysphoria, mild anhedonia, and trouble falling asleep. Morrison claimed that she had never been

treated for depression and denied use of recreational drugs. She reported that her seizures were "well-controlled." Examination was within normal limits. Morrison appeared awake, alert, and oriented, and she was appropriately groomed. She made eye contact and had normal speech rate and volume. Her affect was neutral, her insight was fair, and her judgment appeared good. Dr. Beckmann diagnosed mild depression and prescribed medication. (Tr. 514-15).

Morrison followed up with Dr. Beckmann on November 2, 2012. At that time, she reported "a gratifying improvement." Her mood was stable, her appetite was good, and she reported "functioning much better in the work environment." Morrison said she was "very happy with [the] medication" and told Dr. Beckmann that it was helping her sleep at night with no side effects. Upon examination her affect was bright and pleasant with normal flow and content of thought. Dr. Beckmann told her he was leaving his practice soon and advised that she follow-up with a different doctor in six months. (Tr. 511-12).

Morrison actually saw Dr. Beckmann again on December 4, 2012, after an automobile collision. She reported muscle aches in her low neck and shoulder area. Upon examination, Dr. Beckmann noted that Morrison appeared "mildly uncomfortable" but with no active synovitis, a good range of motion in the neck, and a normal range of motion in the shoulders. Dr. Beckmann gave her a work excuse for two days and diagnosed muscle aching that should heal with

conservative therapy.  (Tr. 507-08).

On February 7, 2013, went to the emergency room complaining of a severe headache.  Morrison reported that she took her boyfriend's Oxycontin.  Her examination was normal, with no vision changes, neck pain or stiffness, and a normal range of motion.  She underwent a lumbar puncture, and the spinal fluid was clear.  Morrison was also given a CT scan of her head, which revealed mild bifrontal and parietal cortical atrophy, unchanged, and was unremarkable without acute intracranial findings.  Morrison was given medication and released.  (Tr. 575-85).

On February 18, 2013, Morrison saw Dr. Wood for a headache.  Morrison's current medications were listed as "none."  Her past medical history included headaches, depression, epilepsy, anxiety, memory loss, and sleep disorder.  (Tr. 613).

Morrison went to a different emergency room on April 6, 2013, for headaches.  She reported having constant, pounding headaches for a couple months and stated that her prescribed medications did not provide any relief.  Physical examination was within normal limits except for headache.  Because Morrison stated during her visit that "they usually give [me] Percocet," hospital staff became concerned about "drug-seeking behavior."  Morrison was given a short course of Percocet and was warned about the danger of taking narcotics for chronic pain.  It

was suspected that "there are more than one pain visit and other hospitals." (Tr. 685-92).

Morrison was taken to the emergency room on May 2, 2013, for a seizure. She was transported to the emergency room by ambulance. Morrison refused a CT scan and stated that she forgot to take her morning seizure medication "quite often." Morrison's past medical history was noted to include polysubstance abuse. Physical examination was within normal limits, with normal range of motion in her back and extremities. (Tr. 727-32). On May 15, 2013, Morrison wrote a letter to the state agency about the incident, claiming that she was discovered on the floor by her family after a seizure. Morrison followed up with Jennifer Szalkowski, M.D., about her seizure on May 7, 2013. Dr. Szalkowski's treatment notes indicate grand mal seizure, vertigo, headache, memory changes, and backache. (Tr. 592-99).

On April 8, 2013, and May 13, 2013, Morrison underwent chiropractic treatment at Wentzville Chiropractic and Acupuncture Center. Morrison reported pain in her neck and shoulder when looking down and with movement and headaches. She denied having pain as the result of an accident during her April visit but told the chiropractor that she had soreness in her back from a recent seizure during her May visit. In May, Morrison reported that her headaches were down and that she "felt much better overall." Treatment notes from those visits

indicate headaches, muscle spasms, and thoracic segmental dysfunction. (Tr. 600, 616-20).

On May 31, 2013, Morrison saw orthopedic surgeon Gregory Galakatos, M.D., complaining of neck pain, headaches, left shoulder, and mid-back pain. Records noted a history of epilepsy, as well as a fall on May 2, 2013. Morrison reported numbness and tingling in the left arm, rated her neck pain at 9 out of 10, and rated her shoulder and back pain at 7 out of 10. Upon examination, Dr. Galakatos observed normal alignment of the cervical spine and a severely limited range of motion, but with no erythema, lesions, masses, drainage, or spinous process tenderness. Morrison's motor strength was 5/5 to the shoulder abductors, biceps, triceps, wrist flexors and extensors, thumb abductors, and intrinsic muscles of hand bilaterally. Sensation in upper extremities was intact. Dr. Galakatos' review of x-rays revealed mild degenerative changes in her left shoulder with no evidence of acute fractures, lesions, or masses. Dr. Galakatos also found mild degenerative changes in her thoracic spine, but no acute fractures, lesions, or masses and good overall alignment. He recommended medication, therapy and exercises. (Tr. 709-15).

On June 3, 2013, Morrison went to the emergency room after stepping on a piece of wood. She reported that she was working in the garden when she was injured. Examination was within normal limits, except for her foot. The wood was

removed from Morrison's foot and she was sent home with a prescription for Percocet. (Tr. 734-37).

On June 5, 2013, Morrison followed up with Dr. Szalkowski about her foot pain, headache, and vertigo. Morrison reported chronic daily headaches and episodes of vertigo lasting hours to days. Morrison stated she was having vertigo during the office visit. Morrison's examination was normal, with normal sensory and motor movements. Morrison was oriented to time, place, and situation, and she displayed appropriate mood and affect. Dr. Szalkowski started Morrison on clindamycin, Fiorinal, oxycodone, and propranolol. (Tr. 668-72).

On June 26, 2013, Morrison went to the emergency room after claiming she fell down 12 steps and hit her head. She denied loss of consciousness, nausea, vomiting, or difficulty with coordination. Morrison had a forehead laceration, as well as neck, back and knee pain. A CT scan of her head revealed no interval changes. Morrison's cut was treated and she was given Percocet. (Tr. 744-47).

On June 28, 2013, Morrison saw Dr. Szalkowski complaining of cold symptoms. She also reported no improvement from her daily headaches despite her low dose of propranolol. Morrison also stated that she had constant, moderate shoulder pain that led to decreased mobility, joint tenderness and musculoskeletal tenderness. Upon examination, Morrison displayed normal, bilateral strength in her extremities, with normal results on the lift off and shoulder shrug tests. Dr.

Szalkowski reported diffuse tenderness in Morrison's left shoulder and observed that she was unable to lift it above 90 degrees. Dr. Szalkowski increased Morrison's dosage of propranolol and adjusted her other medications. (Tr. 659-63).

Morrison went back to Dr. Szalkowski on July 10, 2013, for continued cold symptoms. Examination was within normal limits. Dr. Szalkowski stopped Morrison's prescription for oxycodone and prescribed cheratussin and albuterol sulfate. (Tr. 653-56).

On July 30, 2013, Morrison was taken to the emergency room. She told her family that she was "not feeling right," walked down the stairs, and became unresponsive. A vodka bottle was found at the top of the stairs but Morrison denied drinking alcohol. The EMT administered Narcan (used to reverse the effects of narcotic drugs), and Morrison became more responsive. Morrison arrived at the emergency room "drowsy but able to answer questions." Morrison stated that she had been sleeping all day and did not feel right. Morrison reported that she woke up and discovered her Klonopin was missing and that it was stolen. Morrison claimed that she was compliant with her Keppra regimen. The attending physician believed that Morrison had a likely concussion and a prolonged syncopal episode. Examination was within normal limits. Lab results came back positive for cannabinoids and tricyclics. It was noted that Morrison smoked marijuana on

July 30, 2013. A CT scan of the head showed no interval changes. (Tr. 754-69).

On August 1, 2013, Morrison followed up with Dr. Szalkowski about her emergency room visit. Morrison told Dr. Szalkowski that she tripped on the steps and fell backwards. Morrison reported having chronic daily headaches, neck pain from her fall, and vertigo. Physical examination revealed normal heart rate and rhythm, normal breathing, normal palpation in the neck, no edema in the extremities, some tenderness in the abdomen and cervical spine, moderately reduced range of motion in the cervical spine, a small, well-healed forehead laceration, and normal sensory and motor skills. Morrison was oriented and had appropriate mood and affect. Dr. Szalkowski reviewed the CT and lab reports and adjusted her medications. (Tr. 645-52).

On August 5, 2013, Morrison saw Dr. Wood. Morrison told Dr. Wood that she had a headache and felt off-balance. She also reported having two falls. Dr. Wood reviewed the emergency room records and noted that Morrison tested positive for opiates and marijuana and had two negative CT head scans. Dr. Wood noted that Morrison was "trying for disability." (Tr. 609). Examination was within normal limits. Morrison appeared normal, alert, and oriented. Dr. Wood's assessment included unspecified concussion, migraine, headache, vertigo, and syncope. She recommended Morrison wear a Holter monitor. On August 7, 2013, a Holter report was negative. Dr. Wood also recommended a tilt table evaluation

14

for Morrison's vertigo and syncope.  (Tr. 609-10, 614, 770).

Morrison sought treatment from Dr. Szalkowski on September 3, 2013, for insomnia.  Morrison told Dr. Szalkowski that her insomnia had worsened over the last three weeks after she broke up with her boyfriend, and she admitted being depressed and anxious.  She denied head or facial trauma.  Morrison also reported that her post-traumatic stress disorder had worsened.  Dr. Szalkowski started her on trazodone.  Physical examination yielded normal results, except that Morrison was noted to have poor insight and judgment.  (Tr. 637-41).

Morrison saw Dr. Szalkowski for a follow-up visit on September 9, 2013, "to review the issues that she is seeking disability."  Morrison told Dr. Szalkowski she was diagnosed with grand mal seizures in 2003 and was followed by Dr. Wood, who had her on Keppra for her seizures.  Morrison stated she has seizures 3 times per year.  Morrison also reported having vertigo, chronic headache, post-traumatic stress disorder, and facial spasm.  Morrison said she was on Percocet for headaches.  Upon examination, Morrison had tenderness in her left shoulder and moderate pain with motion.  The examination was otherwise unremarkable except that Morrison appeared anxious.  Dr. Szalkowski increased her dosage of trazodone to help with insomnia.   (Tr. 628-35).

On October 8, 2013, Dr. Wood provided the following handwritten notation on the bottom of a facsimile cover page to Morrison's lawyer:

> Cathy's limitation: cannot stand 3 ft off ground. Lift 5 lb above waist,
> cook on front burners, not able to drive, no baths, no swimming.

(Tr. 809).

On October 9, 2013, Morrison saw cardiologist Michael Missler, D.O., and nurse practitioner Michelle Maloney, N.P. Dr. Missler reviewed the results of her tilt table test on September 11, 2013, which was consistent with postural orthostatic tachycardia syndrome (POTS). Dr. Missler explained the diagnosis. Morrison reported a 6-9 month history of falls and passing out, with 3-4 episodes of passing out since January. Morrison reported sustaining injuries, including needing stitches in her head, and stated that she occasionally felt warm, clammy, and lightheaded upon standing. She also claimed decreased energy, fatigue and sleep issues, but no chest pain. Morrison stated that she was unable to drive or do her usual daily activities because of how she feels. Morrison was given midodrine for POTS. Morrison believed the Holter monitor test results were negative because she had a "good day" on the day she took the test. Dr. Missler also reviewed a recent EKG with normal results. Morrison's physical examination was normal. She was counseled about the importance of medication compliance and told to return in six weeks. (Tr. 717-19). A second 30-day Holter monitor report issued on October 9, 2013, and indicated "one complaint of syncope corresponding to a normal sinus rhythm with rates between 87 and 94 beats per minute and the remainder showing sinus rhythm to sinus tachycardia with occasional ventricular

16

ectopic events." (Tr. 811).

Morrison went to the emergency room on November 10, 2013, complaining of body aches, headaches, and sore throat. She was diagnosed with strep throat. Morrison refused Tylenol and told the nurse to "go tell that doctor I want Dilaudid . . . I have had a headache since February . . . ." A chest x-ray was within normal limits and showed clear lungs, with no pneumothorax or pleural effusion. On November 13, 2013, Morrison again visited the emergency room complaining of worsening strep throat and headache for 3 days without relief from Percocet and ibuprofen. Upon arrival, Morrison rated the severity level of her pain a "10" on a scale of 1 to 10. Examination was within normal limits, except Morrison was noted to be in moderate distress initially. Morrison was given medications and released. (Tr. 814-53).

On November 19, 2013, Morrison saw Linda Therkildsen, D.O., for a follow-up appointment about her strep throat. She also complained of hypotension, headaches, and chronic insomnia. Dr. Therkildsen recommended that Morrison continue her treatment and care with Dr. Missler for POTS, that she get a neurological consultation regarding her grand mal seizures and headaches, and that she continue her existing treatment for vertigo. Dr. Therkildsen recommended melatonin for insomnia. Upon physical examination, Dr. Therkildsen noted that Morrison appeared lethargic and chronically ill-looking, her abdomen was mildly

tender, she had a moderately reduced range of motion in her spine, her gate was slow and unsteady, and that she appeared anxious, with inappropriate mood and affect. Dr. Therkildsen advised Morrison to quit smoking and to decrease or eliminate caffeine from her diet. (Tr. 867-70).

Morrison returned to Dr. Missler's office on November 27, 2013, for her event monitor results. The test revealed no evidence of arrhythmias associated with Morrison's lightheadedness. Nurse Practitioner Maloney suggested Morrison see a psychiatrist for her depression and PTSD. Morrison reported continued dizziness and lightheadedness, but she stated that her symptoms had improved with medication. She also complained of increased fatigue, weakness, and chronic sleep issues. Physical examination was within normal limits, except Morrison was noted to be underweight. (Tr. 858-61).

On December 2, 2013, Morrison was seen by neurologist F. Duane Turpin, D.O., for seizures. Dr. Turpin reported that Morrison had generalized seizures 0.5 times per year for about 10 years. Physical examination yielded normal results. Dr. Turpin's assessment included getting Morrison's "Keppra level within the next few months, particularly if she has a breakthrough event." Morrison told Dr. Turpin she was compliant with her medications regimen. (Tr. 863-66).

Morrison went to Dr. Therkildsen on January 16, 2014, for severe cough and shortness of breath. Dr. Therkildsen's assessment included acute bronchospasm

due to a viral infection, asthma with chronic obstructive pulmonary disease ("COPD") with exacerbation, cough, POTS, and seizure disorder. Upon examination, Morrison was noted to be uncomfortable and lethargic with excessive cerumen in the left and right ear canals, diffuse, decreased breath sounds with tightness in the chest, very soft heart sounds, a tachycardia heart rhythm, and an unsteady gait. Morrison was given medications and told to stop smoking. (Tr. 875-78).

The next day, Morrison had a follow-up appointment with Dr. Turpin. Dr. Turpin noted that Morrison's seizures are "pretty well controlled," and "the recent blackouts are likely the POTS issue." Morrison reported continued headaches. Physical examination was within normal limits. Dr. Turpin continued her medications. (Tr. 871-74).

After her hearing before the ALJ, Morrison was evaluated by consultative neurosurgeon Dennis Velez, M.D., on March 7, 2014. Morrison told Dr. Velez that she was diagnosed with seizures in 2003. She believed the seizures were caused by stress, lack of sleep, or flashing lights. Morrison reported taking medication and becoming seizure free. Morrison said she does not drive since this diagnosis and is being treated for seizures with Keppra by her neurologist. Morrison stated that she was diagnosed with PTSD in 2010, after being in a relationship with a man who tried to assault her. She also had a boyfriend who

died. Morrison said that after these events, she had crying spells, difficulty sleeping, irritability, and loss of appetite. She denied any suicidal ideations. Morrison stated that she had difficulty focusing, getting out of bed, and has minimal energy. Morrison reported that she was diagnosed with POTS in 2012 after a tilt-table evaluation. Morrison claimed memory loss, confusion, and headaches resulted from POTS. Morrison said her POTS medications leave her fatigued. She reported having occasional syncopal episodes but denied needing a pacemaker. Morrison told Dr. Velez she was diagnosed with vertigo in 2005, after reporting blurred vision, weakness, nausea, and the sensation of being intoxicated. Morrison takes meclizine for her vertigo and claimed that she still had weekly seizures. Morrison also reported a long history of headaches which occur approximately three times a week. She takes Topamax, which makes it better. Morrison stated she sometimes had intense pain from her headaches and is unable to stand, lift, or bend over. Morrison also mentioned having memory loss, which she attributed to PTSD. Her listed medications included Keppra, Klonopin, temazepam, Topamax, loratadine, midodrine, propranolol, and compression socks for POTS. Morrison denied any use of recreational drugs and stated her daily activities varied, depending on how she feels. Morrison told Dr. Velez she had headaches, vertigo, lightheadedness, muscle pain, cramps in her legs and arms, syncope, polyuria, difficulties with memory, poor muscle coordination, emotional

problems, wheezing, cough, abdominal pain, nausea, and diarrhea. Morrison stated that she could stand for 20 minutes before needing to lie down due to POTS.

Dr. Velez recorded Morrison's blood pressure sitting, lying down, and standing and noted that her heart rate remained relatively constant for all three readings. Dr. Velez observed that Morrison was awake and alert and cried throughout the exam. Morrison was accompanied by her mother, who stayed throughout the interview and examination. Upon examination, Morrison had a normal and regular heart rhythm, clear lungs, no edema, normal gait and stance with no dysmetria and a negative Romberg's, full strength in upper and lower extremities, no difficulties or complaints of lightheadedness when standing, normal nerve sensation and a negative straight leg raise test, good reflexes with negative Phalen's and Tinsel's signs, no joint swelling, and a normal range of motion. Morrison was able to bend over and touch her toes, squat and rise, walk on her heels, touch her toes, put her arms above her head, and make a fist. She was oriented in all spheres and could recall recent and remote events. Morrison did not complain of a headache during the examination. Dr. Velez's impression was that there was "some" documentation to support her allegation of headaches, but that she was given medication which reportedly controlled her symptoms and that there was no evidence of "treatment failure." He also opined that "there is no documentation of multiple visits to the emergency department for intractable

headache, nausea, vomiting or blurriness of vision.  This condition appears stable right now medically."  Dr. Velez also stated that Morrison had not had a seizure since taking Keppra and that "she had no relevant clinical findings related to this allegation."  As for Morrison's complaints of POTS and vertigo, Velez noted that "[o]rthostatic examination was performed and the claimant had no significant drops in her blood pressure.  She had maintained her heart rate.  She did not become lightheaded."  Dr. Velez discounted Morrison's allegation of memory loss, although he noted that "no major workup had been done for this in the outpatient setting."  With respect to Morrison's claim of PTSD, Dr. Velez acknowledged that Morrison cried during the examination and "expressed her frustration at her multiple medical issues."   He opined as follows:

> Based on all the information gathered today this claimant does not appear to have any limitations as far as sitting, standing or walking. [S]he does not appear to have any lifting or carrying limitation, manipulative limitations and/or verbal or written communication problems.  If this claimant does indeed have a seizure disorder she should continue on Keppra, should not drive a vehicle and should not be working on unprotected heights.

(Tr. 891-96).

In conjunction with the consultative examination, Dr. Velez also completed a medical source statement.  He indicated that Morrison could lift and carry 51 to 100 pounds frequently and up to 50 pounds continuously, as well as sit for six hours, stand for five hours, and walk for four hours out of an eight hour workday.

Dr. Velez found no limitations on Morrison's ability to use her hands and feet, climb, balance, stoop, kneel, crouch, or crawl. Although he stated that she could not work at unprotected heights, he felt Morrison was not limited in her ability to move mechanical parts, operate a motor vehicle, or be exposed to humidity, wetness, dust, odors, fumes, or vibrations. Dr. Velez opined that Morrison could work in extreme cold and heat frequently. Dr. Velez believed that Morrison was not limited in daily activities like shopping, traveling alone, walking without assistance for more than one block, using public transportation, climbing stairs, preparing meals, caring for personal hygiene, and using paper files.

After receiving Dr. Velez's report, Morrison's counsel objected to its admission because Dr. Velez had no experience with POTS or PTSD. Counsel pointed out that Dr. Velez performed an orthostatic examination instead of a tilt table test, which he said is required to diagnose POTS. Counsel also objected to Dr. Velez's functional capacity findings as he did no appropriate objective testing to determine Morrison's limitations related to POTS or PTSD. (Tr. 306). Morrison and her mother also submitted written statements to the state agency about Dr. Velez's examination. Morrison claimed that Dr. Velez "didn't know anything about POTS and was 'googling' the term on his computer during my exam." Morrison also said that Dr. Velez falsely reported that she did not have a headache on the day of the exam. She stated that she told him she had a "bad

headache" and needed help from her mother to walk into the building. Morrison also objected to Dr. Velez's functional limitations findings, claiming that "she only weighs 100 pounds!! Even if I didn't have any medical problems, which I have many, how is a 100 pound lady going to lift 50 to 100 pounds two-thirds of the day." Morrison's mother also stated that Morrison had a headache and was dizzy and lightheaded on the day of the exam. She also stated that Dr. Velez's blood pressure machine was not working properly but that he refused to take her daughter's blood pressure manually. (Tr. 306-12).

<u>Testimony</u>

The ALJ held a hearing in Morrison's case on February 4, 2014. Morrison appeared for the hearing with counsel and testified as follows. At the time of hearing, Morrison weighed 100 pounds. Morrison is a high school graduate and has a license to sell life insurance. She worked as a service representative for Delta Dental and as the marketing and sales director for BJC's dental plan. While at BJC, she supervised five people. After BJC, Morrison opened up her own recreation off-road park on 96 acres of land, but she lost that business when she declared bankruptcy in 2006. Morrison then took a job as a cashier and later manager at a grocery store. Morrison was a property manager for Buccaneer Properties from July through December of 2012, making over $15,000. Morrison also applied for and received unemployment benefits during 2012 and 2013.

Morrison admitted using marijuana "on occasion" and cocaine in the past, although she denied it was "a problem." Morrison stated she couldn't remember whether her last positive drug screen was in August of 2012. Morrison's balance and coordination are off, and she trips and falls a lot. She gets headaches often, and some are severe. Morrison sometimes has to be reminded by her mother to take her medication. She also has insomnia and depression, but she does not like taking anti-depressants because they make her feel "out there." Morrison says she stopped seeing her treating neurologist (Michele Wood) in August of 2013 because she didn't think Dr. Wood took her symptoms and problems very seriously. Morrison gets lightheaded, dizzy, and tired from POTS (postural tachycardia syndrome) on a daily basis. She takes medication to sleep and stays in bed until noon. Morrison has to take breaks cleaning the house or going to the store. She has maybe two good days in an average week. She drinks 15 bottles of water per day because of POTS, so she wakes up often during the night to use the bathroom. Morrison does not drive due to seizures. Her hobbies include watching television. (Tr. 31-47).

Morrison's mother, Patricia Crews, also testified at the hearing as follows. Morrison has lived with her for the last six years. Her daughter wakes up dizzy every morning and is tired all the time. Morrison passes out and has headaches and vertigo. Morrison has one or two good days per week where she is able to get

out of bed, take a shower, and do laundry with frequent breaks.  Her daughter gets

headaches every few days.  (Tr. 52-55).

The ALJ called a vocational expert, who testified as follows in response to

the following hypotheticals:

> ALJ: [W]e have a hypothetical claimant age 49 . . . with twelve years
> of education, the same past work we discussed . . . [T]his hypothetical
> claimant can lift and carry 20 pounds occasionally, 10 pounds
> frequently, can stand or walk for six hours out of eight, sit for six, can
> occasionally climb stairs and ramps, never ropes, ladders, and
> scaffolds, should avoid all exposure to unprotected heights, and
> should not be involved in the operation or any motorized vehicles as
> part of the work.  In addition, this hypothetical claimant is able to
> understand, remember, and carry out at least simple instructions and
> nondetailed tasks, should not work in a setting which includes
> constant regular contact with the general public, and should not
> perform work which includes more than infrequent handling of
> customer complaints.  Given those restrictions, and those alone, could
> this hypothetical claimant return to any past relevant work?
>                                     . . .
> VE: I don't think she could return to her past relevant work, your
> Honor.
>
> ALJ: Okay.  How about examples of other work that might fit with
> this hypothetical?
>
> VE: There would be work she would be able to do, quite a wide
> variety of unskilled work . . . .
>                                     . . .
>
> ALJ: Our second hypothetical  is similar to the first, it's 10 pounds
> occasionally, less than 10 pounds frequently, stand or walk two hours
> out of eight, six for six, everything else stays the same.  So we've got
> that bookkeeping job already, correct?
>
> VE: Yes.

ALJ: And how about one other example?

VE: Another example would be production work . . . .

. . .

ATTORNEY: [I]f you could just as a separate hypothetical assume the restrictions of hypothetical number two, but also add that on at least two days, perhaps two days a week, she wouldn't be able to show up for work due to increased symptoms of dizziness and due to POTS, basically miss two days a week, would that eliminate work?

VE: Yes, it would.

ATTORNEY: Okay. And would it, and even if it were just one day a week, would that eliminate work?

VE: Yes, it would . . . When [missing work] exceeds two days a month it becomes problematic.

(Tr. 47-50).

## **Legal Standard**

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id., or because the court would have decided the case differently. Browning v. Sullivan,

958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is

substantial, a court considers "evidence that detracts from the Commissioner's

decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451

(8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

Where the Commissioner's findings represent one of two inconsistent conclusions

that may reasonably be drawn from the evidence, however, those findings are

supported by substantial evidence. Pearsall v. Massanari, 274 F.3d 1211, 1217

(8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th

Cir. 1980).

Disability is defined in social security regulations as the inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. §1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

Id. at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007). However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. Hildebrand v. Barnhart, 302 F.3d 836, 838

(8th Cir. 2002).

The ALJ's Findings

The ALJ issued his decision that Morrison was not disabled on April 17, 2014. He found that Morrison had the severe impairments of history of seizures, postural orthostatic tachycardia syndrome, headaches, depression, post-traumatic stress disorder, and somatoform disorder. The ALJ found that Morrison retained the residual functional capacity to perform light work, with the exception that she could not climb ladders, ropes, and scaffolds or work at unprotected heights, could only occasionally climb stairs or ramps, and could not operate a motorized vehicle. The ALJ further found that Morrison could understand, remember, and carry out at least simple instructions and non-detailed tasks, but should not work in a setting that includes contact or regular contact with the general public or perform work which involved more than infrequent handling of customer complaints. In fashioning Morrison's RFC, the ALJ determined that her impairments could be expected to produce some of her alleged symptoms; however, he concluded that Morrison's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible to the extent they were inconsistent with his RFC. The ALJ relied on the vocational expert's testimony to determine that Morrison was unable to perform her past relevant work but that that she could work as a cleaner and packager. Because the ALJ determined that these jobs exist

in significant numbers in the national economy, he concluded that Morrison was not disabled.

## Discussion

Morrison first argues that the ALJ erred in formulating her residual functional capacity (RFC) because he did not properly consider all her limitations. RFC is defined as "what [the claimant] can still do" despite his "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The Eighth Circuit has noted the ALJ must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). The record must include some medical evidence that supports the RFC. Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000). "Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000) (internal citation omitted). Morrison claims that the ALJ should have considered her symptoms related to

POTS, including lightheadedness, dizziness, weakness, and fatigue, as well as her limited attention and concentration, when formulating her RFC.

Here, the ALJ properly formulated Morrison's RFC only after evaluating her credibility and discussing the relevant evidence, including Morrison's and her mother's testimony, the medical evidence, Morrison's daily activities, and the testimony of a vocational expert. After consideration of all this evidence, the ALJ concluded that Morrison retained the capacity to perform light work, with modifications tailored to her credible limitations. In so doing, he did not substantially err. In addition to the ALJ's thorough assessment of Morrison's credibility (discussed below), the ALJ also factored into his RFC assessment the objective medical findings of record, including the diagnostic imaging results and physical examination findings, which do not support Morrison's claimed limitations. A CT scan taken of Morrison's head on February 7, 2013, revealed mild bifrontal and parietal cortical atrophy, unchanged, and was unremarkable without acute intracranial findings. A lumbar puncture taken the same day showed clear spinal fluid. (Tr. 575-85). Two CT scans taken on June 26, 2013, and July 30, 2013, were also negative and showed no changes. (Tr. 744-47, 754-69). X-rays taken on May 31, 2013, revealed mild degenerative changes in her left shoulder and thoracic spine, but no acute fractures, lesions, or masses and good overall alignment. (Tr. 709-15). An EKG reviewed on October 9, 2013, was

normal.  Chest x-rays taken on November 10, 2013, were normal and showed clear lungs, with no pneumothorax or pleural effusion.  (Tr. 820).   The Holter monitor test ordered by her primary care physician Dr. Wood on August 7, 2013, was negative.  A second 30-day Holter monitor report issued on October 9, 2013, indicated only "one complaint of syncope corresponding to a normal sinus rhythm with rates between 87 and 94 beats per minute and the remainder showing sinus rhythm to sinus tachycardia with occasional ventricular ectopic events."  (Tr. 811).  On November 27, 2013, Morrison's event monitor results revealed no evidence of arrhythmias associated with Morrison's lightheadedness.  (Tr. 858-61).   However, Morrison did test positive for drug use on July 30, 2013, when taken to the emergency room, allegedly because she became unresponsive and had a seizure.  A vodka bottle was discovered at the top of the stairs where Morrison was found, and she became responsive after the EMT administered Narcan.

Morrison's physical examinations also support the ALJ's RFC determination, as they were largely normal despite Morrison's numerous complaints and repeated visits to various doctors and emergency rooms.  On April 30, 2012, Morrison told Dr. Wood that she was experiencing vertigo, but Morrison had normal tone, strength, and senses, symmetric reflexes, a steady gait, and normal coordination.  Morrison went to the emergency room on February 7, 2013, complaining of headache after taking her boyfriend's Oxycontin.  Her physical

examination and diagnostic tests were normal.  Morrison went to a different emergency room on April 6, 2013, complaining of headaches.  Physical examination there was also within normal limits.  After Morrison requested Percocet, hospital staff became concerned about "drug-seeking behavior."  (Tr. 685-92).  Morrison was transported to the emergency room on May 2, 2013, after a seizure and fall, but her physical examination was again within normal limits, including a normal range of motion in her back and extremities.  Morrison refused a CT scan at that time, stating that she forgot to take her seizure medication "quite often."  (Tr. 727-32).  In May of 2013, Morrison reported that her headaches were down and that she "felt much better overall."  (Tr. 616-20).  Although Dr. Galakatos observed a severely limited range of motion in Morrison's cervical spine after her May 2, 2013, fall, Morrison still had normal alignment, no erythema, lesions, masses, drainage, or spinous process tenderness, and her motor strength was 5/5 to the shoulders, biceps, triceps, wrist flexors and extensors, thumb abductors, and hand, and she had intact sensation in her upper extremities. Morrison told Dr. Szalkowski that she was experiencing vertigo during her June 5, 2013, office visit, but Morrison's examination was normal, with normal sensory and motor movements.  (Tr. 668-72).

Dr. Szalkowski's examinations on June 28, 2013, and July 10, 2013, were essentially normal, except Morrison had diffuse tenderness and a moderately

restricted range of motion in her left shoulder. (Tr. 659-63; 653-56). Morrison's physical examination on July 30, 2013, after allegedly having a seizure and becoming unresponsive, was also within normal limits after she was administered Narcan, although the emergency room physician believed that she may have had a concussion and a syncopal episode. (Tr. 754-69). Dr. Szalkowski's examination on August 1, 2013, again revealed normal heart rate and rhythm, no edema, normal sensory and motor skills, with only a moderately reduced range of motion and some tenderness in the cervical spine. (Tr. 645-52). Dr. Wood examined Morrison four days later, and that examination was also within normal limits. Dr. Wood noted that Morrison had tested positive for opiates and marijuana during her July 30, 2013, emergency room visit. (Tr. 609). Dr. Szalkowski's physical examinations on September 3 and 9, 2013, were again within normal limits, except for some tenderness in Morrison's left shoulder. Morrison told Dr. Szalkowski that she wanted "to review the issues that she is seeking disability." (Tr. 637-41; 628-35). Although Dr. Missler told Morrison that her September 11, 2013, tilt table test results were consistent with POTS, his October 9, 2013, physical examination of her was within normal limits. She was counseled about the importance of medication compliance and told to return in six weeks. (Tr. 717-19).

Morrison was found to have for strep throat during her emergency room

visits on November 10 and 13, 2013, but her physical examinations were otherwise normal, despite Morrison rating her pain as "severe" and demanding Dilaudid instead of Tylenol. (Tr. 814-53). Morrison returned to Dr. Missler's office on November 27, 2013, complaining of continued dizziness and lightheadedness, but she reported that her symptoms had improved with medication. Again, Morrison's physical examination was within normal limits. (Tr. 858-61). Morrison's examination by neurologist Dr. Turpin on December 2, 2013, also yielded normal results. (Tr. 863-66). On her follow-up appointment with Dr. Turpin on January 17, 2014, he noted that her physical examination was normal and that her seizures were pretty well-controlled. (Tr. 871-74). Dr. Velez's consultative examination of Morrison on March 7, 2014, was also normal, and Morrison reported that she was seizure free after she began taking medication. (Tr. 891-96). When Morrison's examination results were not normal, they were generally associated with an isolated event -- such as being involved in an automobile accident, getting a cold or strep throat, or stepping on a piece of wood – rather than her claimed limitations. (Tr. 814-53; 867-70; 659-63; 653-56; 734-37; 668-72; 507-08). The physical examination results do not support the claimed severity of Morrison's symptoms, and the ALJ did not substantially err in considering the medical records when formulating the RFC.

In addition to these diagnostic and clinical findings, the ALJ also considered

and evaluated the medical opinions offered by both treating and consulting physicians. Treating physician Dr. Wood stated that Morrison could not stand more than three feet off the ground, lift more than five pounds above the waist, cook on front burners, drive, bathe, or swim. (Tr. 809). The ALJ discounted this opinion because at the time it was given, Dr. Wood was no longer treating Morrison, it was unclear whether Dr. Wood considered Morrison's drug use when she issued the opinion, and it was not supported by any diagnostic or clinical findings. The opinion of the treating physician should be given great weight only if it is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data) (internal quotation marks and citation omitted). Here, the ALJ properly discounted Wood's conclusory opinion

as it is not supported with diagnostic testing, treatment notes and the other, uncontraverted objective medical evidence of record. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.") (internal quotation marks and citations omitted); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record). Despite his assessment of Dr. Wood's opinion, the ALJ actually incorporated some of Dr. Wood's recommendations, including not driving and only occasionally climbing stairs or ramps, into his RFC determination.

The ALJ also relied upon the opinion of consultative neurologist Dr. Velez, who found that Morrison suffered no limitations with respect to sitting, standing, walking, lifting, carting, or manipulating objects. During examination, Morrison did not become lightheaded when going from sitting, to lying down, to standing, and she did not complain of having a headache, either. Her blood pressure and heart rate were steady and normal, she had a normal gait and stance, and she had full grip strength and range of motion in her extremities. Morrison could bend over and touch her toes, squat and rise, walk on her heels, touch her toes, put her

arms above her head, and make a fist. Based on his examination, Dr. Velez concluded that Morrison could continuously carry up to 50 pounds, frequently lift up to 100 pounds, sit six hours out of an eight-hour workday, stand for five, and walk for hour hours out the workday. He opined that Morrison could continuously climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, or crawl, but that she should not drive or work at unprotected heights.

In formulating the RFC, the ALJ did not adopt Dr. Velez's findings wholesale, but rather significantly restricted Morrison's activities based on all the evidence submitted, including her testimony and that of her mother's. Instead, the ALJ limited Morrison to light work only (defined as lifting and carrying 20 pounds occasionally and 10 pounds frequently), thus alleviating Morrison's concern that "a 100 pound lady [can't] lift 50 to 100 pounds two-thirds of the day." He also addressed Morrison's complaints of vertigo, dizziness, and lightheadedness by restricting Morrison from climbing ropes, ladders, or scaffolds, limiting her climbing of stairs and ramps, and restricting her from operating a motor vehicle or being exposed to unprotected heights. During cross-examination of the VE, Morrison's attorney included an additional hypothetical limitation of one to two absences a week. Yet there is no objective, medical evidence of record to support this limitation. No physician has ever stated that Morrison needed to spend one to two days per week in bed due to fatigue or other limitations or that she was

precluded from working.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir.

2000) (significant that no examining physician submitted medical conclusion that

claimant is disabled or unable to work).  The lack of an objective medical basis to

support a claimant's subjective complaints is an important factor the ALJ should

consider when evaluating those complaints.  Stephens v. Shalala, 50 F.3d 538, 541

(8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994).  The ALJ

did not substantially err in refusing to include this – or any additional – physical

limitation in Morrison's RFC.

Contrary to Morrison's cursory argument, the ALJ also considered

Morrison's mental impairments when formulating her RFC.  Morrison argues that

the ALJ did not include appropriate restrictions addressing her limitations with

concentration, persistence or pace.  I disagree.  The ALJ concluded that Morrison's

mental impairments resulted in moderate difficulties in social functioning,

concentration, persistence, and pace.  To account for Morrison's credible mental

impairments, the ALJ limited her to understanding, remembering, and carrying out

simple instructions and non-detailed tasks, working in a setting that does not

include constant or regular contact with the general public, and performing work

that does not include more than infrequent handling of customer complaints.  In

doing so, the ALJ did not substantially err.  Once again, the ALJ factored into his

RFC assessment a determination of Morrison's credibility and the objective

medical findings of record, including diagnostic test results and treatment notes.

Here, although the ALJ did find that Morrison suffered from depression,

somatoform disorder, and PTSD, he noted that Morrison's mental impairments

were not as severe as she claimed because she did not regularly receive psychiatric

care, used drugs, and was not "fully forthright" about her drug usage. Morrison

was evaluated by Psych Care Consultants in 2010 and diagnosed with depression,

recurrent cannabis abuse, and cocaine abuse in remission. She was prescribed

Lexapro. However, Morrison denied current psychological treatment or

medication during her consultative examination with Dr. Lipsitz in May of 2012.

(Tr. 444-47). Although Dr. Lipsitz assigned Morrison a GAF score of 52, the ALJ

properly discounted this finding based on the lack of regular psychiatric care and

the other, objective medical evidence of record. See Curtis v. Astrue, 338 Fed.

Appx. 554, 555 (8th Cir. 2009) (ALJ properly discounted consulting physician's

opinion since he only saw claimant once, limitations were not adequately

explained, and opinion was contradicted by other medical evidence of record);

Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (consulting physician's opinion

deserves no special weight). Morrison told Dr. Beckmann in October of 2012 that

she had never been treated for depression and denied any recreational drug usage.

Dr. Beckmann diagnosed mild depression and started her on an anti-depressant,

and during her next visit Morrison reported "a gratifying improvement," with

stable mood, good appetite, and normal sleep habits. (Tr. 514-15; 511-12).

Despite her reported success with the anti-depressant, by February of 2013,

Morrison's medications were listed as "none." (Tr. 613). Lack of treatment is

inconsistent with complaints of a disabling condition and is an appropriate factor

for the ALJ to consider when determining a claimant's RFC. See Clevenger v.

Social Security Administration, 567 F.3d 971, 976 (8th Cir. 2009); Kelley v.

Barnhart, 372 F.3d 958, 961 (8th Cir. 2004). Moreover, "[i]f an impairment can be

controlled by treatment or medication, it cannot be considered disabling." Brown

v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004).

The ALJ also relied on Morrison's neuropsychological evaluation by Dr.

Oliveri on May 24, 2012, when formulating the RFC. Dr. Oliveri administered

several tests and noted that Morrison's results were not accurate because "her

performance was grossly incompatible with neurologic reference groups" and her

symptomatic over-focus reflected elements of exaggeration and motivational

factors. Dr. Oliveri also noted that Morrison provided a disjointed and unreliable

history, was uncooperative, and gave a suboptimal effort. (Tr. 453-55). "An ALJ

may discount a disability claimant's subjective complaints if there is evidence that

a claimant was a malingerer or was exaggerating symptoms for financial gain."

Davidson v. Astrue, 578 F.3d 838, 844 (8th Cir. 2009).

It was also appropriate for the ALJ to consider Morrison's drug use and

her inconsistent reporting of that drug use when fashioning her RFC, as they impact her credibility.  See Lewis v. Colvin, 973 F. Supp. 2d 985, 1005-06 (E.D. Mo. 2013).  Although Morrison admitted using marijuana to Dr. Lipsitz, she denied her drug usage to Dr. Beckmann and Dr. Velez.  Morrison tested positive for marijuana during her July 30, 2013, visit to the emergency room and admitted using her boyfriend's Oxycontin on February 7, 2013.  One emergency room suspected drug-seeking behavior after she complained of headaches and asked for Percocet.  Morrison obtained Percocet from emergency rooms on June 3, 2013, and June 26, 2013, and demanded Dilaudid from yet another emergency room on November 10, 2013, after refusing Tylenol for headaches and strep throat.  A claimant's misuse of medications is a valid factor in an ALJ's credibility determination.  Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1985) (claimant's "drug-seeking behavior further discredits her allegations of disabling pain."); Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (claimant's misuse of medications is a valid factor in ALJ's credibility determination).

Morrison's moderate mental impairments were adequately addressed by the RFC which limited her to understanding, remembering, and carrying out simple instructions and non-detailed tasks, working in a setting that does not include constant or regular contact with the general public, and performing work that does not include more than infrequent handling of customer complaints.  Here, the ALJ

properly relied upon the testimony of the vocational expert, the testimony of

Morrison and her mother, and the other evidence of record in determining that

Morrison retained the ability to work as a cleaner and packager, and this finding is

substantially supported by the record as a whole.  See Smallwood v. Chater, 65

F.3d 87, 89 (8th Cir. 1995) (vocational expert can properly offer testimony as to

whether claimant can work after taking into account medical limitations).

To the extent Morrison claims that the RFC is conclusory merely because it

did not follow a specific format set out in Social Security Regulation 96-8p, this

argument is meritless because "an arguable deficiency in opinion-writing technique

does not require [the Court] to set aside an administrative finding when that

deficiency had no bearing on the outcome."  Hepp v. Astrue, 511 F.3d 798, 806

(8th Cir. 2008).  Because Morrison retained the RFC to work as a cleaner and

packager, she was not disabled.  Substantial evidence in the record as a whole

supports the ALJ's RFC determination, so I will affirm the decision of the

Commissioner.

Morrison also contends that the ALJ did not properly evaluate her credibility

under the standards set out in Polaski.  When determining the credibility of a

claimant's subjective complaints, the ALJ must consider all evidence relating to

the complaints, including the claimant's prior work record and third party

observations as to the claimant's daily activities; the duration, frequency and

intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski, 739 F.2d at 1322. While an ALJ need not explicitly discuss each Polaski factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010).

"[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738–39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in her decision that she considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, not the Court, to make. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

Here, the ALJ properly evaluated Morrison's credibility based upon her own

testimony, the objective medical evidence of record, Morrison's daily activities, the conservative nature of her treatment, and the lack of restrictions set out by treating and examining physicians. The ALJ summarized Morrison's testimony regarding her daily activities, subjective allegations of pain, as well as her admitted drug use. He also considered the testimony of Morrison's mother, who stated that Morrison gets dizzy, has vertigo, needs breaks during the day, and takes ibuprofen for headaches. However, the ALJ was not required to believe all of these assertions concerning Morrison's daily activities. Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). Instead, he discounted Morrison's subjective complaints only after evaluating the entirety of the record. In so doing, he did not substantially err, as subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994).

In assessing Morrison's credibility, the ALJ noted that no physician ever rendered an opinion that she was unable to work. As discussed above, the lack of significant limitations set out by treating and examining physicians is relevant to a determination of disability. See Goff , 421 F.3d at 792. The ALJ also noted that Morrison did not seek or require aggressive treatment for her mental impairments. See Clevenger, 567 F.3d at 976. As discussed above at length, the ALJ also concluded that Morrison's subjective complaints of pain were of limited credibility

because they were not supported by the objective medical evidence of record, an important factor for evaluating a claimant's credibility.  Stephens, 50 F.3d at 541.  The ALJ also properly relied upon Morrison's drug usage and her failure to accurately report that drug usage when assessing her credibility.  The ALJ also pointed out that Morrison had not been forthright about her seizure history, either, because she told Dr. Turpin that she had .5 seizures per year, but earlier in the year she claimed that she had three seizures per year.  Morrison then told Dr. Velez that she remained seizure free when on medication.  See Anderson, 51 F.3d at 780; Anderson v. Barnhart, 344 F.3d at 815.  The ALJ also discounted Morrison's credibility because she applied for and received unemployment benefits during the time she had originally alleged that she was disabled.  The acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability and may be some evidence to negate a claim of disability.  Johnson v. Chater, 108 F.3d 178, 180-81 (8th Cir. 1997).  Where, as here, an ALJ seriously considers but for good reasons explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  Substantial evidence in the record as a whole supports the ALJ's credibility determination, so I will affirm the decision of the Commissioner.

## **Conclusion**

Because substantial evidence in the record as a whole supports the ALJ's decision to deny benefits, I will affirm the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate Judgment in accord with this Memorandum and Order is entered this date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of September, 2015.